**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| JANE DOE (A.M.G.), AN INDIVIDUAL, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO: |
| WYNDHAM HOTELS & RESORTS, INC.,<br>Serve: Corporate Creations Network Inc.<br>1521 Concord Pike, Suite 201<br>Wilmington, DE 19803 | |
| WYNDHAM HOTEL GROUP, LLC,<br>Serve: Corporate Creations Network Inc.<br>1521 Concord Pike, Suite 201<br>Wilmington, DE 19803 | |
| SUPER 8 WORLDWIDE, INC.,<br>Serve: Corporate Creations Network Inc.<br>425 W Washington St Ste 4<br>Suffolk, VA 23434 | |
| CHOICE HOTELS INTERNATIONAL SERVICES CORP.,<br>Serve: Corporation Service Company<br>100 Shockoe Slip, Floor 2<br>Richmond, VA 23219 | |
| CHOICE HOTELS INTERNATIONAL, INC.,<br>Serve: Corporation Service Company<br>100 Shockoe Slip, Floor 2<br>Richmond, VA 23219 | |
| AND | |
| TILMA, INCORPORATED<br>Serve: Dilipkumar R. Patel<br>3345 S. Military Hwy<br>Chesapeake, VA 23323 | |
| *Defendants.* | |

{01482145-1 }                                              1

**ORIGINAL COMPLAINT**

COMES NOW Plaintiff Jane Doe (A.M.G.), by and through the undersigned counsel, and respectfully submits her original complaint for damages and makes the following averments.

**SUMMARY**

1.      Jane Doe (A.M.G.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

3.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

{01482145-1 }                                    2

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (A.M.G.), with minimal risk of detection or interruption.

8.      Defendants continued supporting traffickers, including Jane Doe (A.M.G.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotel and specifically at the hotel located at 100 Red Cedar Ct, Chesapeake, VA 23320. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

9.      Jane Doe (A.M.G.) is a natural person who is currently a resident and citizen of Virginia.  Plaintiff will be filing a motion to proceed pseudonym shortly after filing this lawsuit.

10.      A.M.G. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

11.      Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of A.M.G.

12.      Wyndham Hotels & Resorts, Inc., f/k/a Wyndham Worldwide Corporation, d/b/a Super 8 ("WHR") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521

{01482145-1 }                                    3

Concord Pike, Suite 201, Wilmington, DE 19803. Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the subject Super 8. All references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

13.     Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

14.     Super 8 Worldwide, Inc. ("S8W") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 425 W Washington St Ste 4, Suffolk, VA, 23434. Upon information and belief, S8W is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

15.     WHR, WHG, and S8W are referred to collectively as the "Wyndham Brand Defendants" or "Wyndham."

16.     Defendant Choice Hotels International Services Corp. is a Delaware corporation with its principal place of business in Rockville, MD. It can be served by its registered agent Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, VA, 23219.

17.     Choice Hotels International, Inc. is a Delaware corporation. with its principal place of business in Rockville, MD. It can be served by its registered agent Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, VA, 23219.

18.     Choice Hotels International Services Corp. and Choice Hotels International, Inc., are referred to collectively herein as the "Choice Brand Defendants" or "Choice."

19.     Upon information and belief, the hotel located at 100 Red Cedar Ct, Chesapeake, VA 23320 was a Super 8 hotel in 2012 when A.M.G.'s trafficking began. Sometime thereafter during A.M.G.'s trafficking period it became a Quality Inn hotel.

20.     Upon information and belief, the Wyndham Brand Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the hotel located at 100 Red Cedar Ct, Chesapeake, VA 23320 through the Wyndham franchising system.

21.     Upon information and belief, the Choice Brand Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the hotel located at 100 Red Cedar Ct, Chesapeake, VA 23320 through the Choice franchising system.

22.     The Wyndham Brand Defendants and Choice Brand Defendants will be referred to collectively as "Franchisor Defendants."

23.     Defendant Tilma, Incorporated is a Virigina Stock Corporation. It can be served by its registered agent Dilipkumar R. Patel, 3345 S. Military Hwy, Chesapeake, VA 23323. Upon information and belief at all relevant times it owned, operated, controlled, and/or managed the Red Cedar Property. Tilma, Incorporated will be referred to herein as "Franchisee" or "Franchisee Defendant."

<u>**JURISDICTION AND VENUE**</u>

24.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

25.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

26.     A.M.G. was trafficked in this District and Division.

<u>**FACTS**</u>

I.     **Jane Doe (A.M.G.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

27.     Jane Doe (A.M.G.) is a survivor of sex trafficking. Her trafficking began around 2012. She had multiple traffickers in the years she was trafficked.

28.     Her traffickers controlled her through physical violence and force and made her engage in commercial sex acts for their financial benefit. Her traffickers beat her regularly and left visible bruises on her body.

29.     Her traffickers posted advertisements of her for commercial sex services online without her consent.

30.     She did not want to engage in commercial sex acts but when she tried to leave, her traffickers beat her. Her traffickers engaged in a pattern of control and intimidating and threatening behavior that caused A.M.G. to believe she would face serious harm or physical restraint if she did not comply with their ongoing demand that she engage in commercial sex for their financial benefit.

31.     One of her traffickers branded her by forcing her to get a large tattoo of his name on her back.

32.     One of her traffickers threatened to shoot her mom. It was implied that if she did not do what her traffickers wanted, they would hurt her family.

33.     A.M.G. was not allowed to keep any of the money she made.

34.     One of her traffickers had security people to watch her and the other girls he was trafficking at all times. A.M.G. was kept under constant surveillance and was never left alone.

35.     Jane Doe (A.M.G.) was repeatedly trafficked in Defendants' hotel and each Defendant facilitated her trafficking.

36.     Between 2012 and 2014, Jane Doe (A.M.G.) was trafficked at the Super 8 and subsequently Quality Inn located at 100 Red Cedar Ct, Chesapeake, VA 23320 (hereinafter "Red Cedar Property").

37.     Jane Doe (A.M.G.)'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[3] These effects were obvious and apparent to the staff and management of the Red Cedar Property including effects on A.M.G.'s appearance, demeanor, movements throughout the hotel, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that A.M.G. was being continually subjected to coercion, control, and exploitation.

38.     Jane Doe (A.M.G.) remained under the continuous control of her traffickers through at least 2014.

## II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

39.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at their hotel properties, the subject locations and the trafficking of Jane Doe (A.M.G.).

---

[3] *See supra* section II and accompanying footnote for discussion of "red flags" of trafficking.

40.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[5] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90% of the commercial exploitation of children.[7]

41.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

42.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

---

[4] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[5] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[7] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

43.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

---

[9] *See Id.*

{01482145-1 }                                    9

44.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

45.     Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

46.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[11] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

47.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[12]

48.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and

---

[10] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[12] *Id.*

enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

49.    All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," often is related to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of potential trafficking. Reasonable diligence required Defendants to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

50.    The most effective weapon against sexual exploitation and human trafficking is education and training.[13]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

51.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15]  In reference to companies like the

---

[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[15] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

52.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

53.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

54.     Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the

{01482145-1 }                                        12

public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. For example:

- The Wyndham Brand Defendants have recognized their "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[16] The Wyndham brand has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[17]

- The Choice Brand Defendants' Board of Directors has been discussing human trafficking issues since at least 2008 when they adopted a Human Rights Policy that condemns human trafficking and publicly commits to raising awareness among hotel staff about trafficking in its hotels.[18]

- The Choice Brand Defendants claim that they started supporting Polaris, a leading non-profit in the fight against trafficking, in 2010.[19] Upon information and belief, prior to A.M.G.'s trafficking period, the Choice Brand Defendants had reviewed and were familiar with Polaris publications regarding trafficking in the hospitality industry, which include detailed recommendations for how hotels can respond to trafficking.

- In November 2010, the Choice Brand Defendants publicly claimed they were partnering with ECPAT-USA to develop a training module to educate hotel management and staff in the prevention of sex trafficking.[20]

---

[16] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[17] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[18] https://www.Choice Brand Defendantshotels.com/about/responsibility/human-rights-policy
[19] https://www.Choice Brand Defendantshotels.com/about/responsibility/human-rights-policy
[20] *See* Choice Brand Defendants Hotels, Human Rights Policy, available at https://www.Choice Brand Defendantshotels.com/about/responsibility/human-rights-policy; see also ECPAT-USA, Tourism Protection Code of Conduct, available at http://www.ecpatusa.org/code/

55. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

56. Unfortunately, Defendants' promises have proved empty time and again. While Defendants' statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking. Defendants have made the choice, at all levels, to respond inadequately to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like A.M.G.

## III. Sex Trafficking Has Long Been Prevalent at Defendants' Hotel Properties, and Defendants Have Known About It.

57. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (A.M.G.)'s trafficking, that sex trafficking was ongoing and widespread at its properties.

### A. Sex Trafficking at Wyndham Branded Hotels was well Known by Wyndham Brand Defendants.

58. Use of Wyndham branded properties, including Super 8 properties, for sex trafficking is well known to Wyndham.

59. Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has

a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[21] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[22] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[23]

60.    Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[24]

61.    The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex.  Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[25]

62.    In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[26]

---

[21] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[22] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[23] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[24] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")
[25] https://endsexualexploitation.org/wyndham/
[26] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

63.     Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels, including:

- In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Super 8 in California.[27]

- In November 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Super 8 Motel in Virginia.[28]

- In January 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Super 8 Motel.[29]

- In June 2011, an MS-13 gang member was indicted for trafficking girls at a Super 8 Motel near Washington, D.C.[30]

- In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Super 8.[31] In December 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Super 8 Motel in Oklahoma.[32]

- In April 2013, two were arrested for trafficking a juvenile girl at an Illinois Super 8.[33]

---

[27] https://www.wired.com/2010/11/epps/

[28] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671

[29] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm

[30] https://www.thepublicdiscourse.com/2011/10/4034/

[31] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

[32] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[33] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html

- In June 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Super 8 Motel.[34]

- A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Super 8 Motel.[35]

- In 2013, a man was arrested at a Super 8 in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[36]

- In September 2013, a Super 8 motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[37]

- In November 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Super 8 Motel in Texas.[38]

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[39]

64.    These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

65.    Upon information and belief, each of the Wyndham Brand Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where A.M.G. was trafficked.

---

[34] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle
[35] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction
[36] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation
[37] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/
[38] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php
[39] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

66.     Reviews of Super 8 branded properties, which upon information and belief each of the Wyndham Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and the Wyndham Brand Defendants' knowledge of the same. For example:

- An August 2008 review of a Super 8 property in Arizona stated: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[40]

- A January 2010 review of a Super 8 property in Escondido, California stated: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[41]

- A February 2010 review of a Super 8 property in Los Angeles, California stated: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[42]

- A June 2010 review of a Super 8 property in Virginia stated: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[43]

- A July 2010 review of a Super 8 property in Texas stated: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One

---

[40] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html
[41] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html
[42] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html
[43] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews

reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[44]

- An October 2011 review of a Super 8 property in Tennessee stated: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[45]

- A February 2012 review of a Super 8 property in Florida stated: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[46]

- An April 2012 review of a Super 8 property in Virginia stated: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[47]

- An April 2012 review of a Super 8 property in Texas stated: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[48]

- An October 2012 review of a Super 8 property in Florida stated: "the last time i stayed at this super 8, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[49]

- A March 2013 review of a Super 8 property in Louisiana stated: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of

---

[44] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html
[45] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html
[46] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[47] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews
[48] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html
[49] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

the night she and her clients were fighting very loudly over money and services issued!"[50]

- A March 2013 review of a Super 8 property in Ohio stated: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[51]

- A February 2013 review of a Super 8 property in Minnesota stated: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[52]

- An April 2013 review of a Super 8 property in Georgia stated: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[53]

- A July 2013 review of a Super 8 property in California stated: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children.Or anyone for that fact."[54]

- An August 2013 review of a Super 8 property in Ohio stated: "This hotel gives the Super 8 chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[55]

- An October 2013 review of a Super 8 property in Virginia stated: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Super 8 for condoning this kind of activity just to fill a room."[56]

[50] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html

[51] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[52] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html

[53] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

[54] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html

[55] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[56] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html

- January 2014 review of a Super 8 in Lake Worth, FL states "Cops arresting drug dealers upon my arrival. Prostitutes. Very unsafe… Wasted money at super 8. Should have slept under a bridge instead!"[57]

- May 2014 review of a Super 8 in Houston, TX states "However, we have been staying here for a while on business and have noticed lots of young white women (who look and dress like prostitutes) with black men who appear to be their pimps and I've seen them using two rooms using one for "business". Staff should really be more aware of what's really going on here. Also, have smelled pot being smoked everyday and it just seems to be ignored by the staff as well."[58]

- June 2014 review of a Super 8 in Austin, TX states "What can I say? The rooms are small, the furniture tore up, refrigerator not cold, sink and tub would back up with water, carpet sticky, lights with no lampshades, and hookers and pimps running around with the management's blessing."[59]

- July 2014 review of a Super 8 in Norfolk, VA states "This place is in a cheaper end of town and the other guests looked like drunks and hookers hanging out in folding chairs on the balcony. Police were in the parking lot when we arrived."[60] Hotel management responded to this review on July 29, 2014.

- October 2014 review of a Super 8 in Denver, CO states "The cleaning of the place was awful, prostitutes knocking on doors touting for business, the only reason i ended up staying there longer than a night was there was nowhere else. Will never go back again."[61]

- December 2014 review of a Super 8 in Augusta, GA states "My room was right beside permanent residents. Had a prostitute come in my room while i was trying to load luggage in my vehicle...NEVER again will I stay here!"[62]

67.  These reviews are examples. There are many similar online reviews for Super 8 branded hotels, and, on information and belief, there are additional similar reviews and other

[57] https://www.expedia.com/Lantana-Hotels-Super-8-By-Wyndham-Lantana-West-Palm-Beach.h855762.Hotel-Reviews

[58] https://www.tripadvisor.com/Hotel_Review-g56003-d2531544-Reviews-Super_8_by_Wyndham_Houston_North_I_45-Houston_Texas.html

[59] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html

[60] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html

[61] https://www.tripadvisor.ca/Hotel_Review-g33388-d82976-Reviews-Super_8_by_Wyndham_Denver_Stapleton-Denver_Colorado.html

[62] https://www.expedia.com/Augusta-Hotels-Super-8-By-Wyndham-Augusta.h10194.Hotel-Reviews

customer complaints from before 2013 that are not currently available on the internet but which the Wyndham Brand Defendants know about.

68. These and other news stories, guest surveys, and online reviews show that the use of Wyndham and Super 8 hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Wyndham and Super 8 hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

69. Each Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Super 8 branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Red Cedar Property frequently and long after the trafficking of the Plaintiff.

70. Upon information and belief, news stories and reviews establish that, at the time A.M.G. was trafficked at the Red Cedar Property, the Wyndham Brand Defendants knew at a minimum:

  a. The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

  b. Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;

  c. Their franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at its hotel properties;

  d. Their efforts, if any, to stop facilitating sex trafficking in Wyndham branded properties were not effective; and

  e. They were, by their acts and omissions, facilitating sex trafficking at Wyndham branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

71.    Despite the continually mounting evidence that sex trafficking at Wyndham branded properties was ongoing and growing, the Wyndham Brand Defendants did not change course. The Wyndham Brand Defendants chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**B.  Sex Trafficking at Choice Branded Hotels was well Known by Choice Brand Defendants.**

72.    At all relevant times the Choice Brand Defendants adopted a centralized approach to trafficking-related issues at all Choice-branded properties, including Quality Inn properties.

73.    The use of Choice hotels, including Quality Inn properties, for sex trafficking is well known to Choice Brand Defendants. Choice Brand Defendants have known for years that pimps and traffickers use their hotels to carry out their crimes. Scores of news stories dating back for over a decade highlight Defendants' knowledge of such conduct. Choice Brand Defendants knew, or should have known, of the use of Quality Inn branded hotels for sex trafficking ventures. Dating back to dates prior to the sex trafficking of Plaintiff and continuing thereafter, are notable complaints that put them on notice of the frequent use of Quality Inn hotels including the Red Cedar Property for commercial sex and other associated illegal activity.

74.    Upon information and belief, the Choice Brand Defendants monitored both news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories that demonstrate the severity and pervasiveness of prostitution, sex trafficking, and other associated criminal activity at Choice-branded properties, including Quality Inn hotels, include:

- In August 2013, a man was charged with human trafficking after he held a 15-year-old girl against her will at a Quality Inn in Alabama where she was beaten, forced

to do drugs, and sold for sex.[63] The man was sentenced to fifty years for human trafficking.[64] A civil lawsuit was later filed against this Quality Inn.[65]

- In August 2013, two people were charged with sex trafficking of children by force or coercion after they recruited and harbored a 16-year-old girl and kidnapped a 19-year-old girl for prostitution at a Quality Inn in South Carolina.[66]

- In April 2014 a man was arrested for human trafficking young women at a Quality Inn in Florida.[67]

- In May 2014 a man was sentenced to 12 years in prison for sex trafficking a child after being arrested at a Quality Inn in Pennsylvania when he was accompanying a minor to a date.[68]

- In February 2015 a 17-year-old girl was being used as a prostitute at a Quality Inn in Massachusetts before police were able to arrest her pimp and return her to state custody.[69]

- In May 2015 two teenagers were rescued at a Quality Inn in Alabama and a man was arrested for human trafficking.[70]

- In September 2015 a man was convicted and sentenced to one year and six months in state prison for attempting to pimp a woman at a Quality Inn in California.[71]
- In October 2015 a man and woman faced felony charges after they coerced a 15-year-old girl into prostitution and held her at a Quality Inn in North Carolina.[72]

- In June 2016 three people were charged with patronizing prostitution following a sting which was conducted at a Quality Inn in Connecticut.[73]

- In September 2016 three people in Kentucky, including a police sergeant, were arrested in connection to a prostitution investigation that began when authorities received a complaint of a female being held against her will at the Quality Inn.[74]

---

[63] https://www.wsfa.com/story/23118431/shock-after-man-charged-with-human-trafficking-of-girl-in-dothan/

[64] https://www.al.com/news/montgomery/2014/06/houston_county_judge_sentences.html

[65] https://www.al.com/news/birmingham/2017/01/sex_trafficking_survivor_files.html

[66] https://www.wistv.com/story/23048777/two-accused-of-sex-trafficking-children-denied-bond/

[67] https://archive.tcpalm.com/news/vero-beach-man-charged-with-human-trafficking--video-ep-456198732-341865991.html/

[68] https://www.fbi.gov/contact-us/field-offices/pittsburgh/news/press-releases/pittsburgh-man-sentenced-to-12-years-in-prison-for-sex-trafficking-of-a-child

[69] https://www.enterprisenews.com/story/news/2015/02/12/police-arrest-alleged-pimp-in/35171802007/

[70] https://www.al.com/news/montgomery/2015/05/2_teenagers_recovered_south_ca.html

[71] https://orangecountyda.org/press/man-sentenced-to-prison-for-attempted-pimping-of-woman-after-having-her-meet-with-an-undercover-officer-whom-he-thought-was-sex/

[72] https://www.wsoctv.com/news/local/two-accused-coercing-teen-prostitution/27246974/

[73] https://patch.com/connecticut/newhaven/new-haven-men-arrested-prostitution-sting-operation-stratford

[74] https://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during-prostitution-investigation/

- In January 2017 two men pleaded guilty to human trafficking after running a prostitution ring out of a Quality Inn in Mississippi.[75]

- In May 2017 a man was accused of human trafficking after running the operation out of a room at a Quality Inn in Florida.[76]

75. These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Choice branded hotels. Moreover, on information and belief, the Choice Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

76. 63. Upon information and belief, each of the Choice Brand Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where A.M.G. was trafficked.

77. Examples of online reviews that confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Choice branded hotels, including Quality Inn properties, over an extended period, include:

- A January 2006 review of a Quality Inn in Orlando, FL states "Dirty, worn carpets with lumps underneath, no blankets on bed, "clean" towels with hair on them, cigarette stains on tubs, roaches in bathroom, stale smoke smell, no tissues, sink knob broken, security locks on doors broken off, poorly repaired hole in bathroom wall, bathroom door dragged on floor and would not shut all the way, hookers in the parking lot approaching members of our group. When i complained, especially about the hookers, I was told there wasn't much they could do and they would "pass on the complaints to the management."[77]

- A July 2006 review of a Quality Inn in Oakland, CA states "we checked into room 219 (in the back of the motel) only to find numerous prostitutes and apparent pimps

---

[75] https://www.wjtv.com/news/2-men-plead-guilty-in-human-trafficking-case/
[76] https://www.jacksonville.com/story/news/crime/2017/05/31/jacksonville-man-43-arrested-human-trafficking-charges/15757285007/
[77] https://www.tripadvisor.com/Hotel_Review-g34515-d17803954-Reviews-Quality_Inn_Suites_Downtown-Orlando_Florida.html

in the parking lot and some of the first floor rooms. I felt it was a very very unsafe environment and we moved to another motel after only one half hour in the room."[78]

- An August 2009 review of a Quality Inn in Port Allen, LA states "Oh, yea. I was outside having a smoke aboug midnight when two prostitutes began knocking two doors down from us. It seems no one there wanted company, so they began hitting on me until they learned I was with my family."[79]

- A February 2010 review of a Quality Inn in New Orleans, LA states "We checked in late at night following a long drive, not knowing that this hotel was in a seedy part of New Orleans. The parking lot was full of loiterers. There were obvious prostitutes in the lobby, and someone had recently vomited on the elevator. Only one of the lights in the bedroom worked - and there was no door knob on the bathrrom door. There were screams in the hallway during the night. This hotel is unsafe and not clean."[80]

- An August 2010 review of a Quality Inn in Toledo, OH states "Two 19 year olds were shot in the middle of the night at the convenience store next door and a hooker was sitting on the curb out front of the hotel waiting for "a ride" when we left. This place was a real bummer."[81]

- A November 2010 review of a Quality Inn in New Orleans, LA states "I stayed with a colleague for 1 night on a business trip in the area before checking into another hotel because I was disgusted. There were prostitutes working the hotel that knocked on our door and pretty sure drugs were being sold right out of the room beside mine."

- A May 2011 review of a Quality Inn in Atlanta, GA states "When the security lights went out a prostitute and several thugboys started working the parking lot of the hotel.. I specifically told the manager that I never want to stay away from security again."[82]

- An August 2011 review of a Quality Inn in New Orleans, LA states "We got a room in January 2011, on the ground floor, and it had a stench to it that smelled like someone forgot to take their clothes out of the washer. There were people going into the room next to us that were very suspicious. They were yelling & swearing and we think they were pimps or drug dealers, because we heard one of them yelling

---

[78] https://www.tripadvisor.com/Hotel_Review-g32810-d80444-Reviews-Quality_Inn_Oakland-Oakland_California.html
[79] https://www.tripadvisor.com/Hotel_Review-g40379-d92936-Reviews-Quality_Inn_Suites_Port_Allen-Port_Allen_Louisiana.html
[80] https://www.tripadvisor.com/Hotel_Review-g60864-d93140-Quality_Inn-New_Orleans_Louisiana.html
[81] https://www.expedia.com/Toledo-Hotels-Quality-Inn-Alexis-Rd.h40044.Hotel-Reviews
[82] https://www.expedia.com/Atlanta-Hotels-Quality-Inn-Atlanta-Northeast-I-85.h15487.Hotel-Reviews

at a female telling her that "this is the way I make my money." Needless to say, we left and got our money back. Scary!"[83]

- March 2012 review of a Quality Inn in Payson, UT states "Dirty rooms, rude staff, worst hotel experience ever. And for some reason there were a lot of police cars in the parking lot and they were asking women if they were prostitutes. I wish I was making that up. Apparently it's a good place to get an afternoon delight and Payson is prostitute heavy. I'd never been to Payson before but I didn't think a small town would have this problem. I left as soon as I could in the morning to avoid any officers and/or prostitutes."[84]

- A February 2013 review of a Quality Inn in Downey, CA states "Be aware that there is the potential for some undesirable people around the property. One night we had a drunken woman screaming the the parking lot that she was going to kill herself. Two mornings later we saw what appeared to be a prostitute waiting for visitors in her room with the door proped open half way."[85]

- June 2013 review of a Quality Inn in Lester, PA states "You want a room in the front/lit area. Do NOT take a room in the back/unlit area. We parked there (briefly) and there were people on the balcony/aisle drinking. I mentioned this to the clerk and was told that the back of the building is for the cash customers. I am fairly sure he meant hookers."[86]

- July 2013 review of a Quality Inn in Fresno, CA states "I am pretty sure there was prostitute "working" from the parking lot and I believe she was using the hotel, ew! I brought this to the staffs attention when we were checking out and she just looked at us and said " oh yeah"."[87]

- October 2013 review of a Quality Inn in Atlanta, GA states "…sketchy security foot patrol
  hookers come and go parking lot has sketchy characters at night recurring smell of drugs…"[88] Hotel management responded to this review on October 7, 2013.

- February 2014 review of a Quality Inn in San Diego, CA states "I had to stay here for a month for business costs. There was a hooker getting the work done on her what seemed as loud as possible as it happened on at least 5 occasions that woke

---

[83] https://www.tripadvisor.com/Hotel_Review-g60864-d93140-Quality_Inn-New_Orleans_Louisiana.html
[84] https://www.yelp.com/biz/quality-inn-payson
[85] https://www.tripadvisor.com/Hotel_Review-g32308-d76773-Reviews-Quality_Inn_Near_Downey_Studios-Downey_California.html
[86] https://www.tripadvisor.com/Hotel_Review-g53021-d3491361-Reviews-Quality_Inn_Philadelphia_Airport-Lester_Pennsylvania.html
[87] https://www.yelp.com/biz/quality-inn-and-suites-fresno-northwest-fresno
[88] https://www.tripadvisor.com/Hotel_Review-g60898-d86271-Reviews-Quality_Suites_Atlanta_Buckhead_Village_North-Atlanta_Georgia.html

me from mid sleep. The room had an awful dirty dingy Angel to it. Oh and btw it is located in pretty much a ghetto as with the hooker."[89]

- April 2014 review of a Quality Inn in Charleston, SC states "We had a 2 inch gap underneath our door when it was completely shut, a spider was on the wall. Along with bugs in the framed art, there was obvious prostitution and a dead lizard in the corner. Never go here this place is horrid."[90]

- November 2014 review of a Quality Inn in Vacaville, CA states "This place is a seedy as they come. Pulled up to the room after being on the road for 8 hrs with our kids and realized most of the clientele was either going to or coming from the shady bar in the parking lot. All night people were loud, I swear there was some prostitution going on. My kids were up scared from all the yelling. They finally fell asleep about 1am and thanks god they did bc around 3 the husband and I woke to very loud sex noises coming from the room next to ours."[91]

- February 2015 review of a Quality Inn in Spokane, WA states "On the first weekend we were there and after returning to the hotel around 10:00 pm we were walking down the hallway entrance to the elevators and approaching us were three apparent prostitutes. The older one made the statement to the two younger ones that "you better not turn down anything tonight" end quote. They walked right by the front desk to get to the front exit door. Any facility that promotes and allows such things to occur in their family oriented facility is not where I will ever bring my family back again."[92] Hotel management responded to this review on February 5, 2015.

- April 2015 review of a Quality Inn in Riverside, CA states "On our third night we were graced by a hooker and a John who didn't even know her name on the side of us. We heard multiple drug deals happen, and I'm not talking about weed... Then they started to fight loudly in the room then took it right outside of our door. I didn't know whether to call the cops or hit the floor."[93]

- May 2015 review of a Quality Inn in Winston Salem, NC states "Wasn't even there 5 minutes after checking in with my sons, when someone was soliciting prostitution to us. Mind you, my kids are 15 and 16 year olds. In other words offering us services."[94]

---

[89] https://www.tripadvisor.com/Hotel_Review-g60750-d83092-Reviews-Quality_Inn_San_Diego_I_5_Naval_Base-San_Diego_California.html
[90] https://www.expedia.com/Charleston-Hotels-Quality-Inn-Charleston-Gateway.h24247.Hotel-Reviews
[91] https://www.yelp.com/biz/quality-inn-and-suites-vacaville?start=80
[92] https://www.tripadvisor.com/Hotel_Review-g58759-d225255-Reviews-or700-Quality_Inn_Downtown_4th_Avenue-Spokane_Washington.html
[93] https://www.yelp.com/biz/quality-inn-riverside-near-ucr-and-downtown-riverside
[94] https://www.expedia.com/Winston-Salem-Hotels-Quality-Inn-University.h26374.Hotel-Reviews

- September 2015 review of a Quality Inn in Killeen, TX states "I would recommend you stay far from this hotel! Also there is prostitution going on here and it harbors the wrong type of people."[95]

- February 2016 review of a Quality Inn in Hollywood, FL states "HOWEVER, The facility is crawling with prostitutes. They are in the lobby, pool area and common areas. They are not forward and didn't make any maneuvers but had my children been with me their major presence would have been extremely uncomfortable."[96]

78.     These reviews are only representative examples. There are many similar articles and reviews about sex trafficking and other associated criminal activity at Choice-branded hotels.

79.     These and other news stories, guest surveys, and online reviews show that the use of Choice and Quality Inn hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Choice and Quality Inn hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

80.     Each Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Quality Inn branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Red Cedar Property frequently and long after the trafficking of the Plaintiff.

81.     Upon information and belief, news stories and reviews establish that, at the time A.M.G. was trafficked at the Red Cedar Property, the Choice Brand Defendants knew at a minimum:

    a. The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

    b. Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;

---

[95] https://www.expedia.com/Killeen-Hotels-Quality-Inn.h4655354.Hotel-Reviews
[96] https://www.tripadvisor.ca/Hotel_Review-g34296-d313345-Reviews-Quality_Inn_Suites_Hollywood_Boulevard-Hollywood_Broward_County_Florida.html

c.  Their franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at its hotel properties;

d.  Their efforts, if any, to stop facilitating sex trafficking in Choice branded properties were not effective; and

e.  They were, by their acts and omissions, facilitating sex trafficking at Choice branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

82.  Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, the Choice Brand Defendants continued to earn revenue through engaging in conduct that they knew or should have known would continue to facilitate that trafficking.

## C.  The Wyndham Brand Defendants, Choice Brand Defendants, and Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at the Red Cedar Property.

83.  Sex trafficking was widespread and pervasive at the Red Cedar Property specifically.

84.  The Wyndham Brand Defendants, Choice Brand Defendants, and Franchisee knew or should have known about the sex trafficking pervasive at the Red Cedar Property based on obvious indicators of this activity.

85.  Online reviews and articles confirm the presence of criminal activity associated with sex trafficking at the Red Cedar Property:

- 2009 Tripadvisor review states "Don't do it. I stayed here and there was a couple of hookers working the area. I am pretty sure the guy next door was strung out on something. He would crawl out and just lay half in and half out of the room. Then a couple of rooms down there was about 6 gun shots and people screaming and running about 2am. Then a few minutes later there was I think return fire. Top it off it took cops 40 minutes to show up. I can't beleave what had happen there in the motel. Never will I stay in a hotel with Hookers standing around outside with a drug pusher trying to sell me CRACK. Don't stay here unless you want this crap to happen to you."[97] A member of hotel management responded to this review on November 15, 2011.

---

[97] https://www.tripadvisor.co.nz/Hotel_Review-g57597-d230321-Reviews-or75-Quality_Inn-Chesapeake_Virginia.html

- 2012 Tripadvisor states "RUN FOR THE HILLS! If you like beds with blood, urine and God knows what else on them. If you like to have a sore throat from the stench of smoke. If you like your clothes and skin to be permeated with a funky smell. If you like your socks to turn brown within minutes. If you like the power to go out and no one to apologize for the inconvenience. If you like to see prostitutes comes and go. If you like room service (who lives in the motel) to tell you they aren't changing your bed sheets. If you like to see homeless people with shopping carts sitting next to your car. If you like to touch remotes, phones, tv's and get a weird nasty film on your fingers that smells, then by all means book at this motel!!"[98] A member of hotel management responded to this review on September 5, 2012.

- 2018 Expedia review states "… And speaking of guests, it would appear that the hotel serves as temporary lodging for the down-and-out; I'll say no more about that, other than that the semi-permanent clientele are the noisiest guests I've ever shared a facility with -- up and down the halls, shouting about all night long, all three nights."[99]

86.     A population of traffickers, including Jane Doe (A.M.G.)'s traffickers, repeatedly chose to use the Red Cedar Property for their sex trafficking activity. They selected these hotels because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Red Cedar Property. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Red Cedar Property based on obvious indicators of this activity.

87.     This population of traffickers, including A.M.G.'s traffickers, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

---

[98] https://www.tripadvisor.co.nz/Hotel_Review-g57597-d230321-Reviews-or75-Quality_Inn-Chesapeake_Virginia.html
[99] https://www.yelp.com/biz/quality-inn-chesapeake?start=10&sort_by=date_asc#reviews

{01482145-1 }                          31

88.     There were other victims being trafficked at the Red Cedar Property at the same time as A.M.G., including other victims being trafficked by the same trafficker, and there were obvious signs these victims were being trafficked.

89.     The conduct of Defendants facilitated trafficking of a number of victims by a population consisting of multiple traffickers at Red Cedar Property. Defendants developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

90.     Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Red Cedar Property prior to Jane Doe (A.M.G.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

91.     All knowledge from the staff at the Red Cedar Property is imputed to Franchisee, which employed the hotel staff. Thus, Tilma knew about the widespread and ongoing trafficking at the Red Cedar Property, including the trafficking of Jane Doe (A.M.G.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed

to the Wyndham Brand Defendants and the Choice Brand Defendants based on the existence of an actual agency relationship as described below.

92. Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, Franchisee learned or should have learned about the obvious signs of widespread trafficking at the Red Cedar Property, based on non-public sources of information including but not limited to:

a. surveillance of the property;

b. internal investigations;

c. customer complaints;

d. monitoring of customer feedback;

e. information received from law enforcement;

f. and other sources of non-public information available to Franchisee.

93. Upon information and belief, each of the Choice Brand Defendants knew or should have known about the widespread and ongoing trafficking at the Red Cedar Property, including the trafficking of A.M.G., because of information available through numerous channels, including but not limited to:

a. Collection and review of surveillance footage from the Red Cedar Property by the Choice Brand Defendants;

b. The Choice Brand Defendants' protocol that, on its face, required staff of the Red Cedar Property and Franchisee to report suspected criminal activity and suspected trafficking to the Choice Brand Defendants;

c. The Choice Brand Defendants' regular, unannounced inspections of the Red Cedar Property;

d. Information obtained by the Choice Brand Defendants' field-based associates that visited hotels, including the Red Cedar Property, to discuss trafficking. to discuss human trafficking issues;

e. Franchisee and the Choice Brand Defendants' joint involvement in soliciting, monitoring, analyzing, and responding to guest surveys and guest complaints;

f. The Choice Brand Defendants' capture, retention, and analysis of extensive data about all aspects of the operation through the backend of systems it required Franchisee to use at the Red Cedar Property.

94. Upon information and belief, the Choice Brand Defendants adopted a protocol that, on its face, required hotel staff and the Franchisee to report suspected criminal activity, including suspected prostitution and sex trafficking, to the Choice Brand Defendants. Based on the existence of this protocol and the widespread and obvious trafficking at the Red Cedar Property, there were, upon information and belief, multiple instances of suspected sex trafficking that were reported to the Choice Brand Defendants.

95. Upon information and belief, the Wyndham Brand Defendants knew or should have known about the widespread trafficking at the Red Cedar Property based on:

a. The obligation of hotel staff and franchisee to report suspected criminal activity, including sex trafficking, to the Wyndham Brand Defendants;

b. The Wyndham Brand Defendants' regular monitoring of online reviews;

c. The Wyndham Brand Defendants' collection and monitoring of customer surveys and complaints;

d. The Wyndham Brand Defendants' requirement that franchisee submit regular and detailed reports to the Wyndham Brand Defendants about day-to-day hotel operations;

e. The Wyndham Brand Defendants' collection and monitoring of data about guests at the Red Cedar Property, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. The Wyndham Brand Defendants' supervision and control over day-to-day operations of the Red Cedar Property through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the Wyndham Brand Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.  The Wyndham Brand Defendants' regular inspections of the Red Cedar Property;

h.  The Wyndham Brand Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i.  The Wyndham Brand Defendants' access to surveillance and security systems;

j.  Information provided to the Wyndham Brand Defendants by law enforcement; and

k.  Other sources of information available to the Wyndham Brand Defendants.

96.  Upon information and belief, under the Wyndham Brand Defendants' protocols, which on their face required hotel staff and franchisee to report suspected criminal activity to the Wyndham Brand Defendants, hotel staff and management were required to report and did report numerous instances of suspected sex trafficking to the Wyndham Brand Defendants prior to A.M.G.'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Red Cedar Property.

97.  Upon information and belief, the Wyndham Brand Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Red Cedar Property based on their supervision and monitoring of the property.

**D. Defendants knew Jane Doe (A.M.G.) was being trafficked at the Red Cedar Property because of the apparent and obvious "red flags" of sex trafficking.**

98.  During the period that Jane Doe (A.M.G.) was trafficked at the Red Cedar Property, there were obvious signs that her traffickers were engaged in sex trafficking:

a.  Jane Doe (A.M.G.) would usually book the room herself. The hotel staff observed her and saw that she was emotional, nervous, scared, and often bruised. She was dressed provocatively and had little to no baggage. She was always in the presence of and being monitored by her trafficker or an enforcer who her trafficker designated to monitor her.

b.  The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards.

c.  A.M.G. would book two rooms at a time, one for her and one for her trafficker and his enforcers.

d.  A.M.G. would stay at the Red Cedar Property for multiple days at a time and had to go to the front desk each day to pay for the rooms again.

e.  Other girls were being trafficked at the same hotel at the same time as A.M.G. by her trafficker and multiple other traffickers. Collectively they would see up to fifty johns per day.

f.  Hotel staff knew what was going on because they would put all of the trafficking victims at the end of a back hallway near a door they kept unlocked.

g.   When she was with a john her trafficker or his enforcers would often wait in the hotel's stairwell/hallway or linger outside in the parking lot.

h.  Immediately after she saw a john, the trafficker would usually go up to her room to collect the money or she would go to the parking lot to give it to him. The hotel staff saw him go up and down many times a day without A.M.G.

i.  The "Do Not Disturb" door hanger was used very frequently.

j.  Housekeeping staff was usually prevented from entering the room for regular cleaning, towel exchange, and other standard room services.

k.  A.M.G. requested extra towels from housekeeping and went into the vending machine area. Hotel staff observed that she was dressed provocatively and was emotional, nervous, scared, and often bruised. She was always followed and watched by her trafficker or his enforcer.

l.  Jane Doe (A.M.G.) had up to twelve johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

m.  There was heavy foot traffic in and out of Jane Doe (A.M.G.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

n.  After Jane Doe (A.M.G.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers and lubricant.

o.  Depending upon how things were going, Jane Doe (A.M.G.) was trafficked for multiple days at a time at a single location.

p.  While at this hotel, A.M.G. tried to escape but her trafficker caught her, dragged her back to the hotel room, and beat her. Everyone nearby, including hotel staff, heard her screaming.

q. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

99. Based upon information and belief, multiple employees at the Red Cedar Property, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

100. As such, Defendants knew or were willfully blind to the fact that Jane Doe (A.M.G.) was being trafficked at the Red Cedar Property.

101. Given these obvious signs, Franchisor Defendants knew or should have known about the trafficking of Jane Doe (A.M.G.) based on their policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

102. The Franchisor Defendants and Franchisee had constructive knowledge of the trafficking of A.M.G. at the Red Cedar Property because that trafficking was the direct result of the Franchisor Defendants and Franchisee facilitating trafficking at the Red Cedar Property.

103. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham and Choice branded hotels, and at the Red Cedar Property, Franchisor Defendants and Franchisee each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Red Cedar Property and to make a reasonable investigation in response to signs of potential sex trafficking. If the Defendants had used reasonable prudence, they would have been aware of Jane Doe (A.M.G.)'s trafficking at the Red Cedar Property and that they were benefiting from such trafficking.

**IV. Defendants actively facilitated sex trafficking at the Red Cedar Property, including the trafficking of Jane Doe (A.M.G.)**

104.    Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (A.M.G.) at the Red Cedar Property because the trafficking was the direct result of Defendants facilitating her trafficking at the properties.

**A. Franchisee facilitated the trafficking activity at the Red Cedar Property, including the trafficking of A.M.G.**

105.    Franchisee is responsible for the acts, omissions, and knowledge of employees of the Red Cedar Property when operating these hotels because these acts and omissions were committed in the scope and course of employment, because Franchisee ratified these acts and omissions, and because Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee, of human trafficking occurring in the Red Cedar Property.

106.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Red Cedar Property, Franchisee continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

107.    Franchisee knew or was willfully blind to the fact that A.M.G. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate A.M.G.'s sexual exploitation.

108.    Franchisee also facilitated widespread trafficking at the Red Cedar Property, including the trafficking of A.M.G., in ways including:

   a. developing relationships with traffickers, including A.M.G.'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

   b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of A.M.G. and other victims;

c.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e.  failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

g.  providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

h.  accommodating specific requests made by traffickers.

109.  Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including A.M.G.

110.  Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

111.  Policies purportedly enacted and enforced by Franchisors to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Red Cedar Property by either Franchisor Defendants or Franchisee. A.M.G.'s trafficker was able to continue the trafficking venture at the Red Cedar Property. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, A.M.G.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Red Cedar Property.

Furthermore, had Franchisee Defendant properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, A.M.G.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Red Cedar Property.

**B. The Wyndham Brand Defendants facilitated the trafficking activity at the Red Cedar Property, including the trafficking of A.M.G.**

112.    Upon information and belief, the Wyndham Brand Defendants participated directly in aspects of the operation of the subject Wyndham properties that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (A.M.G.), as follows:

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report security issues to franchisor;

h. requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j.   setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k.   requiring franchisees to use a system to monitor and track housekeeping requests;

l.   setting policies for when and how housekeeping services are provided;

m.   collecting and monitoring data that shows patterns of use of housekeeping services;

n.   setting policies for when and how hotel staff can accept tips.

113.   Wyndham Brand Defendants directly participated in and retained day-to-day control over renting rooms at the subject Wyndham properties by, among other things:

a.   controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.   controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c.   requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d.   reserving rooms and accept payments without requiring franchisee approval or involvement;

e.   controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f.   requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g.   requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h.   requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i.   requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j.  ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k.  exercising control over the price of rooms;

l.  controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n.  collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o.  assuming sole ownership over all guest information;

p.  overseeing do not rent (DNR) lists for its branded properties.

114.   The Wyndham Brand Defendants had a direct business relationship with traffickers operating at the Red Cedar Property because, among other things, the Wyndham Brand Defendants directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Wyndham Brand Defendants by developing brand loyalty and intentionally choosing Wyndham hotels because it was known they created a favorable environment for trafficking.

115.   Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham properties, Wyndham Brand Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (A.M.G.).

116.   Wyndham Brand Defendants knew or should have known that Jane Doe (A.M.G.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (A.M.G.)'s sexual exploitation.

117.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Wyndham properties, the Wyndham Brand Defendants continued participating in a venture at that hotel, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

a.  adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b.  adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c.  adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d.  adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e.  providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f.  adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at subject Days Inn;

g.  implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

118.    If Wyndham had exercised reasonable diligence when operating the Wyndham properties and in the areas where it retained control, Wyndham would have prevented the Wyndham properties from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.M.G.). Instead, Wyndham engaged in the course of

conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.M.G.).

119.   The Wyndham Brand Defendants should have known about A.M.G.'s trafficking because it retained control over the training of the staff of the Red Cedar Property regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the Wyndham Brand Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of A.M.G. at the Red Cedar Property. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

120.   The Wyndham Brand Defendants should have known about A.M.G.'s trafficking because they also retained control over the response of Wyndham hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the Wyndham Brand Defendants facilitated sex trafficking, including the sex trafficking of A.M.G. in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

121.   The Wyndham Brand Defendants also should have known about A.M.G.'s trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including Red Cedar Property, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Red Cedar Property. The Wyndham Brand Defendants and allowed traffickers to access rooms for the purpose

of harboring their victims, including A.M.G. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

122.    The Wyndham Brand Defendants also should have known about A.M.G.'s trafficking because they retained control over the security of the Red Cedar Property through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Red Cedar Property. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the Wyndham Brand Defendants had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to they Wyndham Brand Defendants.

123.    A.M.G. exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the Wyndham Brand Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

124.    Moreover, A.M.G.'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Red Cedar Property over an extended period because the Wyndham Brand Defendants adopted policies and practices that insulated A.M.G.'s trafficker from significant risk of detection or disruption.

**C.  The Choice Brand Defendants facilitated the trafficking activity at the Red Cedar Property, including the trafficking of A.M.G.**

125.    The Choice Brand Defendants directly participated in the rental of rooms at the Red Cedar Property in ways including but not limited to:

a. The Choice Brand Defendants controlled all details of the guest reservation, check-in, and payment processes through its management of and control over all systems used for those processes and through its adoption and enforcement of detailed and specific policies dictating the means and methods used for the day-to-day implementation of these processes.

b. The Choice Brand Defendants directly took reservations for rooms at the Red Cedar Property and accepted payment for those rooms through a central reservation system ("CRS") that it controlled and operated. This CRS included a toll-free telephone reservation system, a proprietary internet site, mobile phone and tablet reservation applications, and interfaces with global distribution systems and other internet reservation sites.

c. The Choice Brand Defendants could make reservations and take payment for rooms at the Red Cedar Property without any involvement or approval by Franchisee.

d. The Choice Brand Defendants directly entered into agreements with third parties regarding the distribution of room inventory in its branded hotels, including its franchised hotels.[100]

e. When a guest did not make a reservation in advance through the CRS, The Choice Brand Defendants nonetheless controlled the specific process used to register a walk-in guest and generate a reservation for that guest.[101]

f. The Choice Brand Defendants set or otherwise controlled room prices, required discounts, and reward programs. The Choice Brand Defendants also controlled the room rates offered to each guest.[102]

g. The Choice Brand Defendants controlled all data related to room rentals; every time someone makes a reservation, checks in, or checks out, the transaction goes directly through The Choice Brand Defendants' data center.[103]

h. The Choice Brand Defendants controlled and restricted the ability of Franchisees and hotel staff to refuse or cancel a reservation.

i. The Choice Brand Defendants established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the Red Cedar Property until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be

---

[100] https://www.sec.gov/Archives/edgar/data/1046311/000104631117000006/chh1231201610-k.htm

[101] https://www.The Choice Brand Defendantsadvantage.com/cA_Functionality.pdf

[102] https://www.The Choice Brand Defendantsadvantage.com/cA_Functionality.pdf

[103] https://www.raritan.com/resources/case-studies/detail/no-sleepless-nights-for-The Choice Brand Defendants-hotels-data-center-team

{01482145-1 }                                          46

collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

j.  The Choice Brand Defendants required Franchisees to use The Choice Brand Choice ADVANTAGE property management system, which was owned, maintained, and controlled by The Choice Brand Defendants, for virtually all aspects of hotel operations related to room rentals. Through the backend of this system, the Choice Brand Defendants exercised control over day-to-day processes.

k.  The Choice Brand Defendants maintained back-end access to the Choice ADVANTAGE property management system, which it used to collect, track, and report comprehensive information about each guest at the Red Cedar Property.

l.  The Choice Brand Defendants also participated in day-to-day operations regarding reservations by synchronizing the rate and inventory information for the Red Cedar Property with the CRS and making day-to-day decisions about rates.

126.  Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Red Cedar Property, the Choice Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

127.  The Choice Brand Defendants knew or should have known that A.M.G. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Plaintiff A.M.G.' s sexual exploitation.

128.  The Choice Brand Defendants retained control over the details and methods of aspects of the operation of the Red Cedar Property that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, they participated in a venture with sex traffickers who were using the Red Cedar Property as a venue for their trafficking. Moreover, as a result of this retained control, the Choice Brand Defendants had both the opportunity and the duty to prevent A.M.G.'s trafficking. The Choice Brand Defendants directly participated in and retained control over specific aspects of the operation of the Red Cedar Property related to trafficking by:

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report security issues to the Choice Brand Defendants;

h. requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisees to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use of housekeeping services.

129. The Choice Brand Defendants had a direct business relationship with traffickers operating at the Red Cedar Property because, among other things, the Choice Brand Defendants directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Choice Brand Defendants by developing brand loyalty and intentionally choosing Choice hotels because it was known they created a favorable environment for trafficking.

{01482145-1 }

48

130.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Red Cedar Property, the Choice Brand Defendants continued operating the Red Cedar Property in a way that they knew or should have known would result in facilitating additional sex trafficking at these hotels, including by:

a.  adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including A.M.G.'s traffickers, to secure rooms without providing their own identifying information;

b.  adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including A.M.G.'s traffickers, to pay for rooms using non-traceable methods;

c.  adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d.  adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e.  providing traffickers continued access to Franchisor-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f.  adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the Red Cedar Property;

g.  implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

131.    But for the Choice Brand Defendants' failure to exercise ordinary diligence when operating and controlling the Red Cedar Property, including when exercising control over staff training and response to suspected criminal activity on property, they would have known that A.M.G. was being trafficked there. Thus, constructive knowledge of A.M.G.'s trafficking is imputed to the Choice Brand Defendants.

132.     If the Choice Brand Defendants had exercised reasonable diligence when operating the Red Cedar Property, the Choice Brand Defendants would have prevented this hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of A.M.G., and would not have benefited from that trafficking. Instead, the Choice Brand Defendants engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of A.M.G., resulting in financial benefit to the Choice Brand Defendants.

133.     The Choice Brand Defendants should have known about A.M.G.'s trafficking because it retained control over the training of the staff of the Red Cedar Property regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the Choice Brand Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of A.M.G. at the Red Cedar Property. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Brand Defendants.

134.     The Choice Brand Defendants should have known about A.M.G.'s trafficking because they also retained control over the response of Choice hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the Choice Brand Defendants facilitated sex trafficking, including the sex trafficking of A.M.G. in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Brand Defendants.

135.     The Choice Brand Defendants also should have known about A.M.G.'s trafficking because they retained the control to adopt and enforce policies on sex trafficking for their

{01482145-1 }                                        50

properties, including Red Cedar Property, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Red Cedar Property. The Choice Brand Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including A.M.G. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Choice Brand Defendants.

136.    The Choice Brand Defendants also should have known about A.M.G.'s trafficking because they retained control over the security of the Red Cedar Property through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Red Cedar Property. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the Choice Brand Defendants had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to they Choice Brand Defendants.

137.    A.M.G. exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the Choice Brand Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

138.    Moreover, A.M.G.'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Red Cedar Property over an extended period because the Choice Brand Defendants adopted policies and practices that insulated A.M.G.'s trafficker from significant risk of detection or disruption.

139.    The Choice Brand Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including A.M.G.

140.    The Choice Brand Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## V.    Defendants' Ventures at the Red Cedar Property

### A. Wyndham Brand Defendants and Franchisee's ventures at the Red Cedar Property.

141.    Each of the Wyndham Brand Defendants generated substantial income from the Red Cedar Property, receiving a share of the profits from room rentals collected at the hotel. The fees generated by the Wyndham Brand Defendants were primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' profits increased with each room rental at the Red Cedar Property, including each room rented to a trafficker. Revenue generated from rooms rented at the Red Cedar Property was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room to a trafficker, including A.M.G.'s trafficker.

142.    Franchisee profited from every room rented to a trafficker or for use in trafficking at the Red Cedar Property, both from the room fee and from fees for other hotel services.

143.    In ways described more fully above, the Wyndham Brand Defendants and Franchisee knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, the population of sex traffickers operating out of the Red Cedar Property, including A.M.G.'s trafficker. (hereinafter "Venture 1").

144.    The Wyndham Brand Defendants and Franchisee formed this continuous business relationship and implicit understanding with the traffickers at the Red Cedar Property by

continuing to rent rooms to be used for trafficking (including A.M.G.'s trafficking) after the Wyndham Brand Defendants and Franchisee knew or should have known that the rooms were being used for unlawful trafficking.

145.    This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Brand Defendants and Franchisee were generating revenue by renting the hotel rooms.

146.    This implicit understanding developed because sex traffickers, including A.M.G.'s, frequently used the Red Cedar Property for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Brand Defendants and Franchisees that created a favorable environment for sex trafficking to flourish.

147.    Both the Wyndham Brand Defendants and Franchisee participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisee provided "boots on the ground" at the hotel, and the Wyndham Brand Defendants played a primary role in renting rooms at the Red Cedar Property and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

148.    The Wyndham Brand Defendants and Franchisee participated in the venture by continued renting rooms to traffickers, including A.M.G.'s, after they knew or should have known that victims like Jane Doe A.M.G. were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Red Cedar Property as a venue for their illegal activities.

149.    Wyndham Brand Defendants and Franchisee did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns"

(providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

a. The population of traffickers, including A.M.G.'s, were familiar to the staff at the Red Cedar Property;

b. These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Red Cedar Property but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

d. Defendants provided additional services to traffickers (including A.M.G.'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

e. The staff designated an area of the hotel, in the back of a hallway but near an unlocked door, for traffickers, which facilitated their illegal activities.

150. The criminal traffickers operating at the Red Cedar Property as part of Venture 1 violated 18 U.S.C. §1591 as to victims including A.M.G.

151. If Wyndham Brand Defendants and Franchisee had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from A.M.G.'s trafficking at Red Cedar Property.

152. In ways described more fully above, the Wyndham Brand Defendants and Franchisee also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Red Cedar Property (hereinafter "Venture 2").

153. The Wyndham Brand Defendants and Franchisee had a longstanding business relationship pursuant to which they jointly participated in operation of the Red Cedar Property with a shared goal of maximizing revenue, including gross room revenue.

154.    The Wyndham Brand Defendants and Franchisee, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Red Cedar Property by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

155.    Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Red Cedar Property, which resulted in A.M.G. and other victims being harbored, maintained, and provided in the rooms of the Red Cedar Property. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisee who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

156.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Brand Defendants and Franchisee participated in the venture by continuing to operate the Red Cedar Property in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of A.M.G. The Wyndham Brand Defendants continued Franchisee with operational support, use of trademarks, marketing services, and other resources to operate the Red Cedar Property in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**B.  Choice Brand Defendants and Franchisee's ventures at the Red Cedar Property**

157.    Each of the Choice Brand Defendants generated substantial income from the Red Cedar Property, receiving a share of the profits from room rentals collected at the hotel. The fees generated by the Choice Brand Defendants were primarily based on gross room rentals; therefore, the Choice Brand Defendants' profits increased with each room rental at the Red Cedar Property,

including each room rented to a trafficker. Revenue generated from rooms rented at the Red Cedar Property was distributed among the Choice Brand Defendants, with each benefiting from each rental of a hotel room to a trafficker, including A.M.G.'s trafficker.

158.    Franchisee profited from every room rented to a trafficker or for use in trafficking at the Red Cedar Property, both from the room fee and from fees for other hotel services.

159.    In ways described more fully above, the Choice Brand Defendants and Franchisee knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, the population of sex traffickers operating out of the Red Cedar Property, including A.M.G.'s trafficker. (hereinafter "Venture 1").

160.    The Choice Brand Defendants and Franchisee formed this continuous business relationship and implicit understanding with the traffickers at the Red Cedar Property by continuing to rent rooms to be used for trafficking (including A.M.G.'s trafficking) after the Choice Brand Defendants and Franchisee knew or should have known that the rooms were being used for unlawful trafficking.

161.    This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Choice Brand Defendants and Franchisee were generating revenue by renting the hotel rooms.

162.    This implicit understanding developed because sex traffickers, including A.M.G.'s, frequently used the Red Cedar Property for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Choice Brand Defendants and Franchisees that created a favorable environment for sex trafficking to flourish.

163.    Both the Choice Brand Defendants and Franchisee participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business

from traffickers and facilitated their trafficking activity. As further described above, Franchisee provided "boots on the ground" at the hotel, and the Choice Brand Defendants played a primary role in renting rooms at the Red Cedar Property and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

164. The Choice Brand Defendants and Franchisee participated in the venture by continued renting rooms to traffickers, including A.M.G.'s, after they knew or should have known that victims like Jane Doe A.M.G. were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Red Cedar Property as a venue for their illegal activities.

165. Choice Brand Defendants and Franchisees did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

    a. The population of traffickers, including A.M.G.'s, were familiar to the staff at the Red Cedar Property;

    b. These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Red Cedar Property but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

    c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

    d. Defendants provided additional services to traffickers (including A.M.G.'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

    e. The staff designated an area of the hotel, in the back of a hallway but near an unlocked door, for traffickers, which facilitated their illegal activities.

166.    The criminal traffickers operating at the Red Cedar Property as part of Venture 1 violated 18 U.S.C. §1591 as to victims including A.M.G.

167.    If Choice Brand Defendants and Franchisee had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from A.M.G.'s trafficking at Red Cedar Property.

168.    In ways described more fully above, the Choice Brand Defendants and Franchisee also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Red Cedar Property (hereinafter "Venture 2").

169.    The Choice Brand Defendants and Franchisee had a longstanding business relationship pursuant to which they jointly participated in operation of the Red Cedar Property with a shared goal of maximizing revenue, including gross room revenue.

170.    The Choice Brand Defendants and Franchisee, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Red Cedar Property by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

171.    Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Red Cedar Property, which resulted in A.M.G. and other victims being harbored, maintained, and provided in the rooms of the Red Cedar Property. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisee who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

172.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Choice Brand Defendants and Franchisee

participated in the venture by continuing to operate the Red Cedar Property in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of A.M.G. The Choice Brand Defendants continued Franchisee with operational support, use of trademarks, marketing services, and other resources to operate the Red Cedar Property in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI. Franchisee Defendant and the Staff at the Red Cedar Property Acted as Actual Agents of Franchisors.

### A. Franchisee Defendant and the Staff at the Red Cedar Property Acted as Actual Agents of Wyndham

173. Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee and staff at the Red Cedar Property, which are Wyndham Brand Defendants' actual agents or subagents.

174. The Wyndham Brand Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the subject Wyndham properties through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Brand Defendants as they oversaw and supervised hotel operations.

175. The Wyndham Brand Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Brand Defendants imposed on the franchisees:

    a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used; and

b.  covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c.  dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions; and

d.  significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

176.   In addition to the ways described above, upon information and belief, Wyndham Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the subject properties, including the following ways:

a.  Wyndham Brand Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

b.  Wyndham Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

c.  Wyndham Brand Defendants provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d.  Wyndham Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  Wyndham Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.  Wyndham Brand Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g.  Wyndham Brand Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h.  For certain products and services that franchisee was required to purchase to operate the property, Wyndham Brand Defendants designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i.  Wyndham Brand Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j.  Wyndham Brand Defendants set required staffing levels for the subject properties;

k.  Wyndham Brand Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l.  Wyndham Brand Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m.  Wyndham Brand Defendants provided benefits for employees of franchised hotels;

n.  Wyndham Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Franchisee Defendants to pay associated costs;

o.  Wyndham Brand Defendants generated reports and analysis of guest complaints and online reviews for the subject properties;

p.  Wyndham Brand Defendants set detailed requirements for insurance that Franchisee Defendant must purchase;

q.  Wyndham Brand Defendants exercised or retained control over the franchisee's day-to-day accounting and banking practices;

r.  Wyndham Brand Defendants regularly audited the books and records of Franchisee Defendant;

s.  Wyndham Brand Defendants conducted frequent and unscheduled inspections of the subject properties;

t.  Wyndham Brand Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising

agreement if franchisee violated any of Wyndham' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject properties;

u.  Wyndham Brand Defendants controlled all marketing for the subject properties, directly provided marketing services, and prohibited Franchisee Defendant from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v.  Wyndham Brand Defendants exercised or retained control over all aspects of building and facility design;

w.  Wyndham Brand Defendants imposed detailed recordkeeping and reporting requirements on Franchisee Defendant regarding virtually all aspects of hotel operations;

x.  Wyndham Brand Defendants supervised and controlled day-to-day operations of the subject properties through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendant to use;

y.  Wyndham Brand Defendants required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z.  Wyndham Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

177.  Upon information and belief, Wyndham Brand Defendants had the right to and did enforce its control over Franchisee Defendant through various methods, including:

a.  the right to conduct detailed inspections of the subject properties;

b.  monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;

c.  directing Franchisee Defendant to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d.  mandating training and education for franchisees and/or hotel staff;

e.  employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f.  the right to impose fines or penalties;

g.  the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

h.  the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

178.  The Wyndham Brand Defendants are also vicariously liable for Franchisee and the hotel staff because, as further described above, they retained and exercised control over the specific instrumentalities and aspects of operations that caused A.M.G.'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. They Wyndham Brand Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

**B.  Franchisee and the staff at the Red Cedar Property acted as actual agents of the Choice Brand Defendants.**

179.  The Choice Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee and staff at the Red Cedar Property, which are the Choice Brand Defendants' actual agents or subagents.

180.  The Choice Brand Defendants subjected Franchisee to detailed standards and requirements regarding the operation of the Red Cedar Property through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Choice Brand Defendants s they oversaw and supervised hotel operations.

181.  The Choice Brand Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, these standards, protocols, and requirements:

a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee used at the Red Cedar Property; and

b.  covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishing, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c.  dictated the specific manner in which Franchisee and hotel staff must carry out most day-to-day functions at the Red Cedar Property; and

d.  significantly exceeded what was necessary for the Choice Brand Defendants to protect registered trademarks.

182.    In addition to the ways described above, upon information and belief, the Choice Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee's day-to-day operation of the Red Cedar Property, including the following ways:

a.  The Choice Brand Defendants required Franchisee and management of the Red Cedar Property to participate in mandatory training programs, both during onboarding and on an annual basis, regarding all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Choice Brand Defendants to protect its trademarks.

b.  The Choice Brand Defendants retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected.

c.  The Choice Brand Defendants controlled the details of training conducted for hotel staff by Franchisee by requiring the use of standardized training methods and materials, including developing online, role-specific training that Franchisees was required to use.

d.  The Choice Brand Defendants adopted detailed job descriptions for each position at the Red Cedar Property and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

e.  The Choice Brand Defendants set required staffing levels for the Red Cedar Property.

f.  The Choice Brand Defendants exercised significant control over the procurement decisions of Franchisees by requiring it to buy products from "qualified vendors" and limiting its ability to purchase products from other vendors.

g.  The Choice Brand Defendants imposed and enforced detailed requirements for all aspects of hotel facilities.

h.  The Choice Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the Red Cedar Property and directly participated in the response and/or supervised and dictated Franchisee's response to customer complaints or other feedback.

i.  The Choice Brand Defendants required the Red Cedar Property to participate in a mandatory guest complaint resolution system operated, managed, and overseen by the Choice Brand Defendants.

j.  The Choice Brand Defendants required Franchisee to join and participate in a Franchisees association with other the Choice Brand Defendants brand hotels.

k.  The Choice Brand Defendants controlled all marketing for the Red Cedar Property, including all website pages, and prohibited Franchisee from using any website, social media, advertising, or other public communication without written approval from the Choice Brand Defendants.

l.  The Choice Brand Defendants required Franchisee to refer all guests who it could not accommodate to other the Choice Brand Defendants-branded hotels.

m.  The Choice Brand Defendants required Franchisee to purchase insurance and set specific requirements for that insurance.

n.  The Choice Brand Defendants imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operation.

o.  The Choice Brand Defendants collected, monitored, and analyzed dozens of reports regarding the Red Cedar Property through the backend of the Choice Brand Choice ADVANTAGE property management system and used these reports to supervise and control the day-to-day operations of the Red Cedar Property.

p.  The Choice Brand Defendants collected, monitored, and analyzed guest information in two separate systems: the CIS (Customer Information System) and the GIS (Guest Insight System) through the backend of the Choice Brand Choice ADVANTAGE property management system and used this information to supervise, monitor, manage, and control the day-to-day operations of the Red Cedar Property.

q.  The Choice Brand Defendants retained the virtually unlimited right to supervise the day-to-day operations of the Red Cedar Property by retaining the right to implement any automatic reporting systems it elected to use.

r.  The Choice Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

s. The Choice Brand Defendants retained the right to inspect the Red Cedar Property, including through unannounced inspections.

t. The Choice Brand Defendants retained the right to impose penalties, including but not limited to written warnings, payment of re-inspection, non-compliance, and guest satisfaction fees, attendance at mandatory training programs and ultimately to the termination of the franchise agreement, on Franchisee for violations of any rule, policy, or standard promulgated by the Choice Brand Defendants.

u. Other actions that deprived Franchisee of independence in the business operations of the Red Cedar Property.

183. The Choice Brand Defendants specifically retained control of the day-to-day operation of Franchisee with regards to aspects of operation of the subject the Red Cedar Property that caused A.M.G.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

184. Upon information and belief, the Choice Brand Defendants had the right to and did enforce its control over the Franchisee through various methods, including:

a. the right to conduct detailed inspections of the Red Cedar Property;

b. monitoring or auditing the Franchisee for compliance with policies and expectations;

c. directing the Franchisee to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff in response to deficiencies;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

g. the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services;

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

185.    At all relevant times, Franchisee acted as the actual agents of the Choice Brand Defendants when operating the Red Cedar Property.

### VII.    Wyndham Brand Defendants are jointly responsible for the trafficking of Jane Doe (A.M.G.)

186.    All the Wyndham Brand Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

187.    Upon information and belief, operation of the subject properties was part of a single unified operation by Wyndham Brand Defendants. Upon information and belief, all Wyndham Brand Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, Wyndham Brand Defendants acted jointly to own, operate, control, manage, and supervise the subject properties. As an integrated enterprise and/or joint venture, Wyndham Brand Defendants were separately and jointly responsible for compliance with all applicable laws.

### VIII.   Choice Brand Defendants are jointly responsible for the trafficking of Jane Doe (A.M.G.)

188.    Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Red Cedar Property were shared and fulfilled jointly by the Choice Brand Defendants.

189.    Upon information and belief, at all relevant times, the Choice Brand Defendants, shared a headquarters, corporate officers, employees, and other resources related to franchising, operation, and control of the Red Cedar Property.

190. Upon information and belief, at all relevant times, the Choice Brand Defendants acted jointly to adopt and enforce policies, procedures, and standards for the Red Cedar Property, to participate in and supervise day-to-day operations at those properties, and to rent rooms at those properties.

191. Upon information and belief, each of the Choice Brand Defendants shared in and benefited from revenue generated from franchising, operation, and control of the Red Cedar Property and received a direct benefit when a room was rented to a trafficker at this hotel property.

192. Upon information and belief, each of the Choice Brand Defendants—through its individual acts and omissions and through its joint acts and omissions with other Choice Brand Defendants—knowingly benefited from participating a venture that it knew or should have known was engaged in a violation of the TVPRA.

193. Moreover, upon information and belief, each of the Choice Brand Defendants participated in a joint venture with the other Choice Brand Defendants regarding the operation, control, and franchising of the Red Cedar Property. The Choice Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other Choice Brand Defendants.

## IX. Defendants are Jointly and Severally Liable for Jane Doe (A.M.G.)'s Damages.

194. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (A.M.G.).

195. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (A.M.G.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

196. Jane Doe (A.M.G.) incorporates all other allegations.

**I.      Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee)**

197. Jane Doe (A.M.G.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

198. Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (A.M.G.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at their respective hotel properties.

199. Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (A.M.G.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**II.     Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

200. Jane Doe (A.M.G.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in

18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

201.    A.M.G. is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

202.    All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendants knew or should have known was engaged in a violation of the TVPRA.

203.    **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating a venture with sex traffickers, including A.MG.'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

    a.    Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Red Cedar Property by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Red Cedar Property to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of A.M.G.

    b.    This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including A.M.G., in the rooms of the Red Cedar Property.

    c.    Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

    d.    Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including A.M.G.'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including A.M.G.). Each Defendant received a financial benefit every time a trafficker rented a room.

e. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including A.M.G.'s trafficking).

204. **Venture 2**: Through acts and omissions more fully described throughout this First Amended Complaint, the Franchisor Defendants received a financial benefit from participating in Venture 2 with Franchisee Defendants operating the Red Cedar Property. Each of the Franchisor Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a. Venture 2 is a commercial venture that resulted from the business relationship between each Franchisor Defendants during its respective time as franchisor for the Red Cedar Property and Franchisee to operate the Red Cedar Property with a common objective of maximizing revenue at the hotels, including gross room revenue.

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Red Cedar Property, including the trafficking of A.M.G. This venture also violated the TVPRA through the conduct of Franchisee, who violated 18 U.S.C §1591(a) as a perpetrator.

c. Each Franchisor Defendant, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. Each Franchisor Defendants knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Red Cedar Property, which increased every time a room was rented including rooms rented to traffickers.

e. Each Franchisor Defendants, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with Franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

205. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to A.M.G.

### III. Cause of Action: Vicarious Liability for TVPRA Violations (Franchisor Defendants).

206.    Franchisee acted as the actual agents of Franchisor Defendants when operating the Red Cedar Property. The agency relationship between Franchisee and each Franchisor Defendant lasted for the period during which the Franchisor Defendants was involved in operation of the Red Cedar Property through its role as franchisor.

207.    Through the acts and omissions described throughout this Complaint, each Franchisor Defendant, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee to operate the Red Cedar Property.

208.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

209.    As a result of the relationship between Franchisee and Franchisors, Franchisors are vicariously liable for the acts of Franchisee, including at the Red Cedar Property. Factors that support this allegation are that Franchisors shared profits, standardized employee training, standardized and strict rules of operations, Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Franchisors had the right to terminate any franchisee that failed to comply with the requirements promulgated by Franchisors. Thus, Franchisors retained control, or the right to control, the mode and manner of work contracted for.

210.    As alleged above, Franchisee is directly liable to A.M.G. for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). The Franchisor Defendants are vicariously liable to A.M.G. for those same violations.

211.     Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Red Cedar Property, enabled and contributed to the sex trafficking of A.M.G.

## DISCOVERY RULE

212.     To the extent Defendants assert an affirmative defense of limitations, Jane Doe (A.M.G.) invokes the discovery rule. At the time she was harmed and through at least 2014, Jane Doe (A.M.G.) was under coercion and control of traffickers who abused and manipulated her. Thus, Jane Doe (A.M.G.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Jane Doe (A.M.G.)—through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of A.M.G. being kept under the control of her traffickers, which Defendants facilitated.

213.     At the time Jane Doe (A.M.G.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed..

214.     To the extent Defendants assert an affirmative defense of limitations, Jane Doe (A.M.G.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (A.M.G.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (A.M.G.) filed this lawsuit.

{01482145-1 }                                              73

215.    As a result of her continuous trafficking through at least 2014, Jane Doe (A.M.G.) was beaten, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

216.    Jane Doe (A.M.G.) was under the continuous control of her traffickers through at least 2014. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights.

217.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (A.M.G.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

218.    Jane Doe (A.M.G.) was subject to continuous trafficking at the subject hotel through at least 2014, which is not more than 10 years before Jane Doe (A.M.G.) filed this lawsuit.

219.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the subject hotel and Defendants' ongoing venture with one another and with criminal traffickers.

## DAMAGES

220.    Defendants' acts and omissions, individually and collectively, caused Jane Doe (A.M.G.) to sustain legal damages.

221.    Defendants are jointly and severally liable for all past and future damages sustained by Jane Doe (A.M.G.).

222.    Jane Doe (A.M.G.) is entitled to be compensated for personal injuries and economic damages, including:

a.   Actual damages (until trial and in the future)

b.   Incidental and consequential damages (until trial and in the future);

c.   Mental anguish and emotional distress damages (until trial and in the future);

d.   Lost earnings and lost earning capacity (until trial and in the future);

e.   Necessary medical expenses (until trial and in the future);

f.   Life care expenses (until trial and in the future);

g.   Physical pain and suffering (until trial and in the future);

h.   Physical impairment (until trial and in the future);

i.   Emotional impairment (until trial and in the future);

j.   Exemplary/Punitive damages;

k.   Attorneys' fees; and

l.   Costs of this action.

m.   Pre-judgment and all other interest recoverable.

## JURY TRIAL

223.   Jane Doe (A.M.G.) demands a jury trial on all issues.

## RELIEF SOUGHT

224.   WHEREFORE, Jane Doe (A.M.G.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (A.M.G.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (A.M.G.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

JANE DOE (AMG), an individual
By Counsel


  /s/ E. Kyle McNew
E. Kyle McNew (VSB No. 73210)
MICHIEHAMLETT, PLLC
310 4th Street N.E., 2nd Floor
P.O. Box 298
Charlottesville, Virginia 22902
P: (434) 951-7200
F: (434) 951-7254
KMcNew@MichieHamlett.com

Joe Fisher (TXSB No. 00787471)
Pro hac vice forthcoming
Provost ✭ Umphrey Law Firm
350 Pine Street, Ste. 1100
Beaumont, Texas 77701
P: (409) 835-6000
F: (409) 813-8609
JFisher@pulf.com

Kenneth T. Fibich
Pro hac vice forthcoming
Texas Bar No.: 06952600
Sara J. Fendia
Pro hac vice forthcoming
Texas Bar No. 06898800
Kelly Bogusevic
Pro hac vice forthcoming
Texas Bar N. 24063159
1150 Bissonnet Street
Houston, Texas  77005
713-751-0025  Telephone
713-751-0030
tfibich@fibichlaw.com
sfendia@fibichlaw.com
kbogusevic@fibichlaw.com

COUNSEL FOR PLANTIFF

{01482145-1 }                                    76